IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:

**ALLIED FINANCIAL, INC.**                    CASE NO. 16-00180 (MCF)

Debtor                                         CHAPTER 11

**ALLIED FINANCIAL, INC.**

Plaintiff

V.                                             ADV. CASE NO. 16-00033 (MCF)

**WM CAPITAL PARTNERS 53, LLC**

Defendant

## OPINION AND ORDER

Plaintiff Allied Financial, Inc. seeks to exercise its redemption right under Article 1425 of the Puerto Rico Civil Code. WM Capital Partners 53, LLC purchased the litigated credit from Scotiabank de Puerto Rico, who had acquired it from the Federal Deposit Insurance Corporation as receiver of R-G Premier Bank, a defunct financial institution. WM posits that federal receivership law preempts the right of redemption and if the Civil Code is not preempted, then Allied failed to timely reimburse the purchase price. The Court finds that Allied has timely asserted its redemption right, which is not preempted by federal law.

## UNCONTESTED FACTS

On April 30, 2010, the Office of the Commissioner of Financial Institutions of Puerto Rico closed R-G Premier Bank's ("R-G") operations and the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver of the failed bank. That same day the FDIC sold

-1-

R-G's assets, which included Allied's loan, to Scotiabank de Puerto Rico ("Scotiabank") through a Purchase and Assumption Agreement ("PAA") containing a Loss-Share Agreement ("LSA").[1] Three years later, Scotiabank filed collection of moneys and foreclosure action against Allied in the Commonwealth of Puerto Rico, Court of First Instance ("the Local Court Litigation"). On July 6, 2015, the FDIC authorized Scotiabank to sell a number of commercial loan-assets, including Allied's, to third parties.[2] On September 30, 2015, Scotiabank sold to WM a pool of mortgages that included Allied's loan and it notified the transfer of the loan account to Allied.

On October 5, 2015, Allied received notice from Scotiabank of the loan assignment to WM.[3] Two days later, on October 7, 2015, Allied sent WM a letter informing that it was exercising its right to redeem WM's litigated credit in the Local Court Litigation, pursuant to Article 1425 of Puerto Rico's Civil Code, P.R. Laws Ann. tit. 31, § 3950 (hereinafter, "Article 1425").[4] On October 8, 2015, WM filed a motion for substitution as plaintiff in the Local Court Litigation[5] and Allied filed a motion to apprise WM that it was exercising its right of redemption under Article 1425.[6] On October 21, 2015, WM disclosed to Allied the alleged price it paid to Scotiabank for its claim.[7] Nine days later, Allied contested said amount, and requested an order from the local court compelling WM to validate the alleged price disclosed.[8] The local court granted Allied's request to validate the price disclosure on November 10, 2015.[9] On November

---

[1] The complete title of the PAA is "Purchase and Assumption Agreement Whole Bank All Deposits Among Federal Deposit Insurance Corporation, Receiver Of R-G Premier Bank of Puerto Rico, Hato Rey, Puerto Rico Federal Deposit Insurance Corporation and Scotiabank de Puerto Rico Dated as of April 30, 2010." The complete title of the LSA is "Commercial Shared-Loss Agreement," included as Exhibit 4.15B to the PAA. https://www.fdic.gov/bank/individual/failed/r-gpremier- puertorico_p_and_a.pdf. See Docket No. 26, ¶14, Docket No. 17.
[2] Docket No. 17, at 2-3, ¶ 6.
[3] Id. at 3, ¶ 8, 12.
[4] Docket No. 128, at 4, ¶ 14.
[5] Docket No. 17, at 3, ¶ 11; Exhibit D.
[6] Id. at 4, ¶ 13; Exhibit F.
[7] Id. at 4, ¶ 14.
[8] Id. at 4, ¶16.
[9] Id.; Exhibit H.

23, 2015, WM moved for reconsideration of the local court's order.[10] Thereafter, on January 15, 2016, Allied filed a voluntary petition under chapter 11 of the Bankruptcy Code which stayed the Local Court Litigation.

### PROCEDURAL HISTORY

Approximately two months after filing its bankruptcy petition, Allied filed the present adversary proceeding pursuant to Fed. R. Bankr. P. 7001(2).[11]  The first cause of action seeks to determine the amount of WM's claim and the extent of its secured claim.  The second cause of action seeks to redeem the amount WM paid to Scotiabank for acquiring Allied's loan account.[12] Allied alleges that it may redeem a litigated credit, meaning the interest of a third party—in this case, WM—who has purchased a stake in the outcome of a civil proceeding. However, the exact amount paid by WM to Scotiabank for Allied's claim remains in dispute.

Rather than answering the complaint or otherwise pleading, WM moved for summary judgment on all counts of the complaint.[13]  WM raised the following arguments: First, that the FDIC's governing statutes preempt redemption. Second, that Allied's alleged right of redemption is substantively deficient under Article 1425.

Allied filed a motion to extend the time to respond to WM's summary-judgment motion alleging that, at the time, it could not present opposing facts pertinent to WM's second ground

---

[10] Id.; Exhibit I.

[11] Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq. All references to "Rule or Rules" are to the Federal Rules of Civil Procedure. References to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

[12] Meanwhile, in the bankruptcy case, Allied objected to WM's proof of claim no. 2, among other grounds, due to the pending adjudication of its redemption right presently addressed in this proceeding.  Plaintiff's objection to claim no. 2, Case No. 16-00180, Docket No. 136.

[13] Docket Nos. 16 & 17. As the case progressed, WM supplemented its motion for summary judgment in Docket Nos. 50, 57, 89 & 143.

for summary judgment. For this reason, Allied requested leave from the court to conduct discovery, pursuant to Rule 56(d)(2) of the Federal Rules of Civil Procedure.[14]

WM opposed Allied's request for discovery arguing that the basis for its summary-judgment motion was under its legal theory of preemption.[15] The court granted Allied's discovery request given that the purchase price WM paid to Scotiabank for the claim is a material fact that had to be established in order for Allied to tender the redemption price. Allied also had to substantiate this fact to respond to WM's summary judgment motion.[16] An extended discovery dispute ensued. Throughout it, WM maintained the position that information related to the price it paid for Scotiabank's claim is uncontested, irrelevant, and privileged from discovery.[17] Having completed discovery, Allied opposed summary-judgment motion and filed a cross-motion for summary judgment.[18]

### JURISDICTION

The court has jurisdiction to hear this case, pursuant to 28 U.S.C. § 1334 and the general order of the United States District Court for the District of Puerto Rico dated July 19, 1984, which refers title 11 proceedings to the bankruptcy court. This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2). The parties have agreed to the bankruptcy court's entry of final judgment.[19]

---

[14] Docket No. 25.

[15] Docket No. 31, Preliminary statement. In its second ground for summary judgment, WM alleges the purchase price for its claim against Allied is an uncontested fact. Docket No. 17, at 4, ¶14.

[16] Court's minutes, Docket No. 60.

[17] Docket No. 31, Preliminary statement; Docket No. 42, at 3, ¶11; Docket No. 73, at 5, ¶¶11-12; Docket No. 95, at 6-7.

[18] Docket Nos. 127 & 128. Allied supplemented its opposition and filed its cross-motion for summary judgment on Docket No. 139.

[19] Court's minutes, Docket No. 60, Docket No. 29, at 6-7, Docket No. 16 and Docket No. 125, at 2.

-4-

## WM'S MOTION FOR SUMMARY JUDGMENT

### I. Standard for Summary Judgment

"In bankruptcy, summary judgment is governed in the first instance by Bankruptcy Rule 7056." Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 762 (1st Cir. 1994). See Soto–Rios v. Banco Popular de P.R., 662 F.3d 112, 115 (1st Cir. 2011). Bankruptcy Rule 7056 incorporates Rule 56 of the Federal Rules of Civil Procedure as the mechanism for adjudicating summary-judgment motions. Summary judgment should be granted only when no genuine issue of material fact exists and the movant has successfully demonstrated his entitlement to judgment as a matter of law. The moving party must show that "there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the record permits a rational factfinder to resolve that issue in favor of either party." Jarvis v. Vill. Gun Shop, Inc., 805 F.3d 1, 7 (1st Cir. 2015). A fact is material "if its existence or nonexistence has the potential to change the outcome of the suit. Id. Establishing a genuine issue of material fact requires evidence that is "significantly probative." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986). "[C]onclusory allegations, improbable inferences or unsupported speculation" are not sufficient to prove a fact. Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 66 (1st Cir. 2004). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

When both parties move for summary judgment, each party must carry its own burden of proof as the moving party in its cross motion and as the nonmoving party in response to the other

party's motion. Wells Real Estate Inv. Trust II, Inc., 615 F.3d 45, 51 (1st Cir. 2010). If there are no disputed material facts, only one party is entitled to judgment as a matter of law. In re Cousins Int'l Food Corp., 553 B.R. 197, 204–05 (Bankr. D.P.R. 2016), aff'd in part, Cousins Int'l Food, Corp., WL 1075044 (B.A.P. 1st Cir. Mar. 21, 2017).

## II.      WM's First Count for Summary Judgment

The court will first address the issue of whether Allied timely exercised its right of redemption under Article 1425 before addressing the issue of preemption. Article 1425 reads as follows:

> Right of debtor to extinguish litigated credit
>
> When a litigated credit is sold, the debtor shall have the right to extinguish the same by reimbursing the assignee for the price the later paid for it, the judicial costs incurred by him, and the interest on the price from the day on which the same was paid.
>
> A credit shall be considered as litigated from the day the suit relating to the same has been answered.
>
> The debtor may make use of his right within nine (9) days, counted from the day the assignee should demand payment of him.

P.R. Laws Ann. tit. 31, § 3950.

The purpose of Article 1425 is to prevent the "trade of litigious credits which were purchased for a price below their actual value, and then the actual price was recovered from the debtor and big profits reaped." Consejo de Titulares v. C.R.U.V., 1993 P.R.-Eng. 840,040, P.R. Offic. Trans., 132 P.R. Dec. 707 (1993); See also Pritzker, 42 F.3d at 65 ("A desire to put an end to litigation and to prevent speculation in lawsuits has resulted in the disapproval by the civil law of the sale of litigious rights [. . .][T]he purpose of article 1425 is to discourage financial speculation in litigation.").

This article confers on a defendant the right to reimburse the interest of a third party (assignee) who has purchased a stake in the outcome of a civil case, also known as a "litigated credit" or "litigious credit." A redemption right under Article 1425 arises in the following context:  1) when the complaint is answered in a lawsuit; 2) the plaintiff's stake in the litigation is sold or assigned to a third party assignee; 3) the debtor makes use of his right within nine (9) days, counted from the day the assignee should demand payment from debtor; and 4) the assignee reimburses the price it paid to the assignor for the plaintiff's stake in litigation along with judicial costs and interest. P.R. Laws Ann. tit. 31, § 3950; Consejo de Titulares v. C.R.U.V., 132 P.R. Dec.707, 1993 P.R.-Eng. 840,040, P.R. Offic. Trans.; Pritzker v. Yari, 42 F.3d 53, 65-66 (1st Cir. 1994).

The court now turns to the nine-day requirement disputed by the parties. A "defendant in an action may make use of his redemption right within nine days, counted from the day the assignee should demand payment." P.R. Laws Ann. tit. 31, § 3950.  If timely raised, a defendant may proceed to tender the price paid by the assignee for the litigated credit's purchase and thus extinguish the litigated credit. The parties present to the court differing arguments regarding the triggering event prompting the nine-day period for Allied to exercise redemption. WM alleges the nine-day time period for Allied to pay full tender of the redemption price was triggered on October 21, 2015, when it informed Allied the alleged reimbursement price. Hence, Allied had until October 29, 2015, to tender the funds to WM or deposit the funds in court. Because Allied failed to tender timely the funds, Allied presently has no redemption right to assert in these proceedings.[20] On the other hand, Allied alleges that it timely asserted its redemption right within

---

[20] Docket No. 16, at 17-18.

the nine days of WM's substitution in the Local Court Litigation on October 8, 2015, and that the tender is stayed until it validates the actual price necessary to extinguish the litigated credit.[21]

Based on First Circuit and Puerto Rico case law, WM's argument requiring from Allied full tender of the redemption price within the nine-day period after its alleged price disclosure is unfounded. The First Circuit court in Pritzker v. Yari, 42 F.3d 53, 69 (1st Cir. 1994) was confronted with an argument from assignees similar to that which WM raises in its summary-judgment motion. The assignees in Pritzker asserted that Article 1425 obligated the borrower "not simply to offer to tender the funds necessary for redemption within the nine-day period, but also actually to tender those funds or, at the very least, deposit them with the court." Pritzker, 42 F.3d at 69.

The Pritzker court found that Article 1425 required a defendant to exercise its redemption right by making an offer of redemption within the nine-day period from the day the assignee should demand payment, and not a full tender of funds. Id. at 70. The First Circuit explained:

> Any other interpretation would significantly undermine the efficacy of the statute, since it would force debtors to marshall the funds immediately on receipt of notice, or else forfeit their rights. Because assignees could more often than not time disclosure of their acquired interests to minimize redemption opportunities, the notice provision would become a trick box. We do not believe that the Puerto Rico legislature intended to place assignees in so advantageous a position.

Id.

The Puerto Rico Supreme Court has found that a defendant may exercise its redemption right by filing a motion within the nine day period mentioned in the statute, requesting that the unknown reimbursement price be revealed. Pereira v. I.B.E.C., 95 P.R. Dec. 28, 67 (1967). Thus, the Puerto Rico Supreme Court held that a defendant's lack of a known price to reimburse an

---

[21] Docket No. 127, at 8, ¶ 15.

assignee is not an obstacle to exercise redemption within the nine-day period. A defendant may raise redemption within the nine-day period and thus preserve its right. Id.

Accordingly, a debtor must notify its offer of redemption to an assignee within nine days from the day the assignee should demand payment. We follow this reading of the statute. As the Pritzker court stated, this reading "allows the debtor merely to offer to redeem the litigated credits within the nine-day period, thus placing the assignees on notice of probable redemption, but without backing the debtor into a cash-flow corner." Id.

Based on the uncontested facts, WM filed its motion for substitution on October 8, 2015, in the Local Court Litigation. Allied notified WM of its intention to redeem under Article 1425 on that same day. Thus, Allied exercised its redemption right within the nine-day period.

Allied does not have to tender the redemption price within the nine-day period. In fact, Allied sought verification of the purchase price before paying such sums in the Local Court Litigation. Allied requested a court order for WM to substantiate the alleged price disclosed. The local court granted Allied's request to validate the reimbursement price. However, it was presumably unable to resolve the controversy due to Allied's bankruptcy filing. Allied continued its redemption action before this court and sought efforts to validate the redemption price. Thus far there is conflicting evidence in regards to the alleged reimbursement price and as such, Allied is presently unable to pay WM for the litigious credit. Once the court determines the reimbursement price, Allied may proceed with the tender or deposit in court of said funds. In the meantime, Allied timely exercised its right to extinguish the litigious credit purchased by WM and therefore WM's first count for summary judgment is denied.

### III. WM's Second Count for Summary Judgment

Turning to the issue of whether Allied's right is preempted by federal law, the Supremacy Clause of the United States Constitution mandates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Pursuant to this mandate, "Congress has the power to preempt state law," Crosby v. National Foreign Trade Council, 530 U.S. 363, 372 (2000), and a "state law that contravenes a federal law is null and void," Tobin v. Federal Exp. Corp., 775 F.3d 448, 452 (1st Cir. 2014). "For preemption purposes, the laws of Puerto Rico are the functional equivalent of state laws." Antilles Cement Corp. v. Fortuño, 670 F.3d 310, 323 (1st Cir. 2012).

### A. Standard for Preemption

A federal statute can preempt a state law in three ways: through express preemption, field preemption, or conflict preemption. Arizona v. United States, 567 U.S. 387 (2012); Franklin California Tax-Free Trust v. Puerto Rico, 85 F. Supp. 3d 577, 595 (D.P.R.), aff'd, 805 F.3d 322 (1st Cir. 2015), cert. granted and aff'd sub nom, Acosta-Febo v. Franklin California Tax-Free Trust, 136 S. Ct. 1938 (2016). Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute. Franklin California, 85 F. Supp. 3d at 595. If Congress does not explicitly preempt state law, preemption may still occur when federal regulation in a legislative field is so pervasive that congressional intent allows no inference that it left room for the states to supplement it. This is known as "field preemption" or "occupying the field." English v. General Elec. Co., 496 U.S. 72, 79 (1990).

Even if Congress has neither expressly preempted state law or occupied the field, state law is preempted to the extent it conflicts with federal law. "Conflict preemption," as it is

-10-

commonly known, may arise in two circumstances: 1) when it is impossible to comply with both federal and state law or 2) when state law stands as an obstacle to achieving the objectives of the federal law.  Crosby, 530 U.S. at 372–73; Telecommunications Regulatory Bd. of P.R. v. CTIA–Wireless Ass'n, 752 F.3d 60, 64 (1st Cir. 2014).

WM's argument encompasses conflict preemption, arguing that the Article 1425 stands an obstacle to the objectives of the FDIC. WM prompts the court to rule that "to the extent that the Right of Redemption interferes with the objectives of the FDIC [. . .] said right is preempted."[22] WM claims that Article 1425 interferes with the FDIC's roles as receiver and administrator of a failed bank's assets and with the FDIC's statutory obligation to resolve the failed bank's affairs in the least costly way possible to its fund.

First, the preemption standard set forth by the Supreme Court is as follows:

> [B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996).

When a challenge to a state law is raised on the basis of preemption, a presumption exists that the state statute is valid. Pharmaceutical Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 74 (1st Cir. 2001), aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644 (2003); Davies Warehouse Co. v. Bowles, 321 U.S. 144 (1944). As such, courts must presume that Article 1425 of the Puerto Rico Civil Code's provision on redemption of litigated credits is

---

[22] Docket No. 143, at 10; See also Docket No. 16, at 8. Nowhere in its briefs does WM specify a provision in the FDIC's statutes or regulations that could expressly preempt Article 1425 on redemption or a similar state statute. Likewise, WM does not present a legal argument in favor of field preemption.

-11-

valid and not preempted by federal law.  To prevail, WM must first rebut the presumption by showing how Article 1425 conflicts with the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (hereinafter "FIRREA"). In order to evaluate whether WM successfully rebuts the presumption, the court begins its analysis with an overview of FIRREA's purpose and goals, and then examines if there is a conflict between Article 1425 and FIRREA.

### B.  FDIC Objectives

Congress enacted FIRREA to promote stability, economic recovery, and increased public confidence in the banking sector. To this end, the FDIC was empowered to serve as receiver for failed financial institutions. <u>Acosta Ramirez v. Banco Popular de Puerto Rico</u>, 712 F.3d 14, 18 (1st Cir. 2013). Congress granted the FDIC express statutory authority to dispose of receivership assets when federally insured financial institutions fail so that the losses borne by federal taxpayers are reduced.  The FDIC has broad authority to "take over the assets. . .and conduct all business of the institution," "collect all obligations and money due the institution," and "preserve and conserve the assets and property of such institution." 12 U.S.C. § 1821(d)(2)(B)(i), (ii), (iv). The FDIC may "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution...." 12 U.S.C. § 1821(d)(2)(E).  The FDIC may "transfer any asset or liability of the institution in default. . .without any approval, assignment, or consent...." 12 U.S.C. § 1821(d)(2)(G)(i)(II). Finally, the FDIC may "exercise ... such incidental powers as shall be necessary to carry out such powers," and "take any action authorized by this Chapter, which the [FDIC] determines is in the best interests of the depository institution, its depositors, or the [FDIC]." 12 U.S.C. § 1821(d)(2)(J)(i), (ii).

The breadth of the FDIC's statutory powers as a receiver are reflected in the legislative history of 12 U.S.C. § 1821.  Congress explained that the authority granted to the FDIC was

-12-

"designed to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default." Sahni v. American Diversified Partners, 83 F.3d 1054, 1058 (9th Cir. 1996) (citing H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 2 (1989)); West Park Assoc. v. Butterfield Sav. & Loan Ass'n, 60 F.3d 1452, 1458 (9th Cir. 1995).

When a state agency declares a bank insolvent and appoints the FDIC as receiver, the FDIC may choose among several alternative ways to either liquidate the bank or sell the bank to another bank as a going concern. The two major alternatives include a straight liquidation, which occurs when the FDIC sells the assets of the bank and pays off the depositors of the bank from the sale proceeds and from the FDIC insurance fund. Liquidation has negative effects on the banking sector as the result of the failing institution's closing. Depositors lose confidence in the specific failed bank. The public in general loses confidence in the entire banking community. Liquidation involves a major loss to the FDIC's insurance fund. Thus, liquidation is not the favored alternative. Federal Deposit Ins. Corp. v. Bank of Boulder, 911 F.2d 1466, 1469 (10th Cir. 1990).

The other alternative involves a purchase and assumption transaction in which an assuming institution purchases most of the failed bank's assets and continues to operate the bank as a going concern. Id. A purchase and assumption transaction involves three parties: the receiver, the acquiring bank, and the insurer. When FDIC is appointed receiver, it simultaneously acts as the receiver of the failed bank and as the insurer of the deposits. Id. Generally, the acquiring institution purchases the assets and assumes the deposit liabilities of the failed bank. The amount of deposit liabilities that the acquiring bank assumes may be greater than the value of the assets it purchases. As explained by the Tenth Circuit court, "[t]o make the purchase of the failed bank attractive to the assuming bank, FDIC/Receiver pays cash to the assuming bank in an amount sufficient to cause the assets the bank purchases to be equal to the

liabilities it assumes. . .The cash paid by FDIC/Receiver to the acquiring bank is paid from FDIC/Corporation's insurance fund." Bank of Boulder, 911 F.2d 1469–70.

As part of the purchase and assumption alternative, the FDIC may assist the acquiring institution—as it did in the case at hand—in acquiring a failed bank's assets through a loss-share agreement. The use of loss share agreements has enabled the FDIC to include more failed bank assets in purchase and assumption transactions. Federal Deposit Insurance Corporation, *Managing the Crisis: The FDIC and RTC Experience*, 193-194, Washington, D.C. (1998). Under this arrangement, the FDIC is obligated to compensate the acquiring institution for a percentage of a portion of the loan that the acquiring institution is unable to collect from borrowers, after exercising its best efforts to do so. The acquiring institution is obligated to refund the FDIC if it subsequently recovers all or part of the outstanding balance on the loan from borrowers. Loss share clauses procure that the FDIC and the acquiring institution share a portion of future losses and recoveries for a specific period of time. Id. Regardless of the resolution alternative that the FDIC may opt for, it must do so in the least costly way possible to its fund. 12 U.S.C. § 1823 (c)(4).

### 1. Is Article 1425 an obstacle to FDIC's objectives?

As mentioned before, the purpose of Article 1425 is to discourage the trade in civil litigation when a plaintiff's stake is sold to a third party. In the instant case, the acquiring institution (Scotiabank) and the FDIC agreed to share losses on acquired loan-assets for a period of five years. The gist of WM argument is that "the FDIC's consent and intervention in the sale of shared-loss assets" from Scotiabank to WM preempts Allied's rights under Article 1425.[23] The court disagrees. Article 1425 does not stand as an obstacle to the FDIC's objectives because

---

[23] Docket No. 143, at 2-3.

-14-

the FDIC concurred in Scotiabank's sale of various loan assets to WM, resulting in the least costly resolution of the failed bank's assets. If that was not the case, FDIC would not have consented to the sale. The FDIC could allow an acquiring institution to sell loan assets to a third party provided the sale results in the least loss. With the FDIC's approval, Scotiabank was able to sell to WM certain assets acquired from the failed bank, including Allied's loan account. The sale presumably occurred because it would result in a lesser cost to the FDIC. By concurring to the sale, the FDIC's statutory authority to resolve the failed bank's affairs in the least costly manner was effectuated.

The court finds no indication that Allied's redemption right under Article 1425 conflicts with the federal scheme of FIRREA or the FDIC's objectives. There is no indication that, subsequent to the FDIC's approval for Scotiabank to sell loan-assets to third parties, the FDIC continues to administer or otherwise have a pecuniary interest in the loan-assets sold to WM, pursuant to the LSA. Thus, there is no legal basis to declare Article 1425's redemption right preempted absent clear indication—rather than speculative or conjectural—of conflict between the FDIC's objectives and Article 1425. The FDIC's objectives to intervene and resolve R-G's loan-assets were effectuated. Thus, WM has failed to rebut the presumption of validity in Article 1425.

Once the loan assets were sold, the FDIC was removed from the transaction between Scotiabank and WM. WM has not pointed to events or situations which further necessitate the FDIC's intervention in WM's acquisition of Allied's loan or to others for that matter. Although WM has submitted a statement under penalty of perjury by Scotiabank's loan officer, WM has not provided any statement from the FDIC to support its argument for conflict preemption. The FDIC is no longer involved at this stage because it allowed Scotiabank to sell certain loss-share assets to third parties. FDIC does not share losses with WM and WM owes no duty to the FDIC.

The FDIC approved of this portfolio sale because it would result in the least costly resolution to it of these assets. Thus, the FDIC's relationship with Scotiabank—in terms of loss-sharing purposes for Allied's loan-asset—is no longer in place once said loan-asset was sold to a third party, WM.

The LSA contractual provisions support Allied's argument that WM is not a beneficiary of the loss-share provisions between Scotiabank and the FDIC. Allied points to several contractual clauses included in the LSA between the FDIC and Scotiabank that disarm WM's argument of the FDIC's continued involvement in subsequent loan-asset sales. The LSA explicitly states that there is no sharing of losses other than between Scotiabank and the FDIC, unless the FDIC approves Scotiabank's change in control or merger with a third party (which is not the case here), to wit:

> **6.4 No Third Party Beneficiary**. This Commercial Shared-Loss Agreement and the Exhibits hereto are for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns and there shall be no other third party beneficiaries, and **nothing in Commercial Shared-Loss Agreement or the Exhibits shall be construed to grant to any other Person any right, remedy or claim under or in respect of this Commercial Shared-Loss Agreement or any provision hereof.**

LSA, at 134 (Emphasis added).

The LSA indicates who are permitted successors and assigns of an acquiring institution. This is not the situation here because there has been no change in corporate control of Scotiabank or a merger with WM. Absent the aforementioned situation, WM is not a third party beneficiary to the LSA. The LSA reads as follows regarding permitted successors or assigns:

> **6.2 Successors and Assigns; Specific Performance.** This Commercial Shared-Loss Agreement, and all of the terms and provisions hereof shall be binding upon and shall inure **to the benefit of the parties hereto and their respective permitted successors and assigns only**. . . [T]he

-16-

Assuming Institution may not assign or otherwise transfer this Commercial Shared-Loss Agreement or any of the Assuming Institution's rights or obligations hereunder (in whole or in part), or sell or transfer of any subsidiary of the Assuming Institution holding title to Shared-Loss Assets or Shared-Loss Securities, without the prior written consent of the Receiver, which consent may be granted or withheld by the Receiver in its sole and absolute discretion. **An assignment or transfer of this Commercial Shared-Loss Agreement includes: (i) a merger or consolidation of the Assuming Institution with or into another company**. . .**(ii) a merger or consolidation of the Assuming Institution's Holding Company with or into another company**. . .**(iii) the sale of all or substantially all of the assets of the Assuming Institution to another company or person; or (iv) a sale of shares by any one or more shareholders that will effect a change in control of the Assuming Institution**. . . .

LSA, at 133 (Emphasis added).

Likewise, the PAA unequivocally states that no third parties—such as WM—shall acquire rights under the LSA contract:

> **13.5 Successors**. [. . .]Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Institution any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Institution and for the benefit of no other person.

PAA, 40-41.

The uncontested facts demonstrate that the LSA contract was neither assigned nor otherwise transferred to WM. WM is not a party to the LSA. Rather, that Scotiabank sold certain loan-assets—including Allied's—with the FDIC's consent, to WM. Scotiabank assigned to WM several loan-assets, with the FDIC's concurrence. Scotiabank did not and could not assign to WM the LSA and the PAA. Therefore, WM did not acquire a right, remedy or claim under or in

respect to the LSA. For this reason, no loss-share provision in the LSA inured to WM's benefit after the loan-asset sale, such as to construe a conflict with the FDIC's objectives.

In the Loan Sale Agreement between Scotiabank and WM, Scotiabank placed WM on notice of the possible redemption right actions that could ensue from its purchase of loan-assets with pending litigation. [24] This provision forewarned WM of a potential claim of redemption under Article 1425.

The court finds no indication of conflict between Article 1425 and the FDIC's objectives, nor has WM brought forth any specific conflict that convinces the court otherwise. Once the FDIC approved Scotiabank's sale of loan-assets to WM, its objectives of minimizing loss had been accomplished. Subsequent events, such as the redemption of litigated credit against WM, do not pose a threat nor have a negative impact on the FDIC's objectives. WM has not presented any facts, nor the court found any facts, which indicate that redemption negatively affects the FDIC. Rather, WM relied on the mere intervention of the FDIC. The crux of the matter lies in a showing of an actual conflict between Article 1425 and the purpose and objectives of the FDIC in the process, not in the FDIC's mere presence. As such, WM has failed to rebut the presumption that Article 1425 of the Civil Code is valid and not preempted.

### 2.     Louisiana and Puerto Rico case law on redemption and preemption

Although WM brings forth no factual conflicts between Article 1425 and the FDIC's objectives, it cites Louisiana and Puerto Rico caselaw to support its position for preemption. WM relies on two main cases from Louisiana: In Peoples Homestead Fed. Bank & Trust v. Laing, 637 So. 2d 604, 606 (La. Ct. App. 1994) and Federal Deposit Ins. Corp. v. Thibaut, No. CIV. A . 96-2294, 1999 WL 102799, at 2 (E.D. La. Feb. 24, 1999. In Peoples Homestead, a Louisiana

---

[24] The court does not quote from Article 7.10 of the Loan Sale Agreement because this particular contract is under seal. Loan Sale Agreement, at 44. Docket No. 127, at 216.

appeals court held that a defendant in a collection action that had been assigned to an acquiring institution through federal receivership could not raise Louisiana's redemption right in order to reimburse the substituted plaintiff with a lesser amount than for what it paid based on preemption. The Peoples Homestead court also concluded that a federal receiver's transfer of a loan asset to an acquiring entity previously belonging to a failed bank did not qualify for redemption right. Similarly, in Federal Deposit Ins. Corp. v. Thibaut, No. CIV. A . 96-2294, 1999 WL 102799, at 2 (E.D. La. Feb. 24, 1999), a federal court for the Eastern District of Louisiana applied the Peoples Homestead ruling to a similar set of facts to conclude that the FDIC's intervention with the failed entity's assets preempted Louisiana redemption right statute, thus barring the defendant from exercising its redemption right.

These cases involve the FDIC's assignment of failed bank assets to an acquiring institution and are thus inapposite to the court's analysis. They interpreted Louisiana's Civil Code provision on redemption which is analogous to Puerto Rico's Civil Code provision on redemption. All the Louisiana cases cited by WM involve purchase and assumption transactions between the acquiring institutions and the FDIC, not third parties (like WM).  The Louisiana courts found that the FDIC's procedures preempted borrower's redemption rights when raised subsequent to an acquiring institution's purchase of a loan-asset from the FDIC. The present case does not involve the FDIC's assignment of failed bank assets to an acquiring institution and therefore is not relevant to the issue before this court. At issue here is whether the defaulting borrower can assert its right of redemption after acquiring institution sells the loan-asset to a third party. As previously mentioned, WM is a subsequent third party removed from the prior transaction between Scotiabank and FDIC.

WM points to various trial and appellate courts decisions from Puerto Rico as well.[25] Like the Louisiana cases, most of these Puerto Rico cases involve the purchase and assignment transactions between the FDIC and an acquiring institution. Doral Bank v. St. Just L.I. Developers & Contractors, Inc., No. KLAN201501740, 2016 WL 860365 (P.R. Cir. Jan. 29, 2016); Bautista Cayman Asset Co. v. Diaz Elec. Inc., No. FCD2013-0632, 2015 WL 9304413 (P.R. Cir. Oct. 29, 2015); Scotiabank de Puerto Rico v. Gomas Gomas y Mas, Inc., No. KCD2005-1025, 2013 WL 4672229, (P.R. Cir. July 12, 2013); Scotiabank de Puerto Rico v. Floresta Gurabo, Inc., No. KCD10-0292, 2012 WL 3205284, (P.R. Cir. June 29, 2012). These cases are not on point. Both the Louisiana and Puerto Rico cases cited above involve borrowers raising a redemption right at a point in which the FDIC transfers a failed bank's assets to acquiring institutions. For this reason, these cases are not helpful in our analysis.[26]

WM cites several Puerto Rico cases where it was a party to litigation involving loan-assets it purchased from acquiring institutions and where the borrower raised the redemption right, similar to this case. Triangle Cayman Asset Co. 2 v. CV Steel Fab. of PR Inc., No. JCD2010-1325, 2016 WL 8347198 at *6 (P.R. Cir. Nov. 30, 2016);[27] WM Capital Partners 53, LLC v. Management & Development Corp., KCD 2013-1474 (906) (Trial Court, March 9, 2016); WM Capital Partners 53, LLC v. Q & S Realty Acquisition Corp., KCD 2013-0681 (Trial Court, June 27, 2016);[28] WM Capital Partners 53, LLC v. Trium Corp., Case No. KCD2014-

---

[25] Decisions from the trial and appellate Puerto Rico courts are not binding. Capestany v. Capestany, 66 P.R.R. 720, 722-723, 66 P.R. Dec. 764 (1946).

[26] The Louisiana cases cited in support by these cases were not faced with the issue that is squarely before this court. These decisions rely on the factual findings set forth in Louisiana cases that dealt with a different situation where a federal receiver transferred failed bank loan-assets to an acquiring institution. Given the distinguishable set of facts in this controversy that differ from the facts that the aforementioned Louisiana courts were faced with, this court does not opine on the implied preemption of Article 1425 for transactions involving the FDIC and an acquiring institution.

[27] Translation supplied by WM on Docket No. 92-1.

[28] Translation supplied by WM on Docket No. 54-1.

-20-

2231 (807) (Trial Court, July 8, 2016).[29]  In these cases, the courts concluded that the FDIC's mere intervention in the resolution of a failed bank preempted Article 1425. Notably, these cases relied on the above-mentioned Louisiana caselaw to extend the reach of preemption to third party loan-asset sales, which as explained before, are not relevant to the issue at hand. [30]

We do not adopt the reasoning of these cases for three reasons. First, the local court cases conclude that the FDIC's mere intervention in the transaction makes Article 1425 inapplicable without any explanation or focus on whether an actual conflict arises with federal law. These cases agree that the transaction from the acquiring institution to a third party is approved and furthers the FDIC's objectives, but fail to tackle why subsequent application of the redemption right might have a negative impact on the transaction which has already fulfilled the FDIC's purpose. This alleged conflict with federal law is the crux of the controversy regarding whether the presumption that Article 1425 is valid is rebutted or not. These cases rely on the mere intervention of the FDIC to preempt it and do not point to actual conflict.

Second, when the local courts pointed out the manner in which the loan-assets were sold, they highlighted the fact that a sealed-bid auction was utilized, which in turn, led them to their preemption analysis. In the instant case, Scotiabank's sale of loss-shared loans to WM was auctioned through sealed bids.[31] One court, for example, construed the loss share provision that required the acquiring institution to sell loan-assets through a sealed-bid auction as a unique sale transaction and a result of the FDIC's intervention. Triangle Cayman Asset Co. 2 v. CV Steel

---

[29] Translation supplied by WM on Docket No. 61-1.

[30] Peoples Homestead Fed. Bank & Trust v. Laing, 637 So. 2d 604, 606 (La. Ct. App. 1994), F.D.I.C. v. Thibaut, No. CIV. A . 96-2294, 1999 WL 102799 (E.D. La. Feb. 24, 1999); In re E. Cameron Partners, L.P., No. 08-51207, 2011 WL 4625368 (Bankr. W.D. La. Sept. 30, 2011).

[31] Black's Law Dictionary defines a "sealed bid" as "[a] bid that is not disclosed until all submitted bids are opened and considered simultaneously." Black's Law Dictionary 154 (7th ed. 1999). This means that, at auction, bidders will not know the highest bid for assets sold.

Fab. of PR Inc., No. JCD2010-1325, 2016 WL 8347198 at *6 (P.R. Cir. Nov. 30, 2016).[32] Another local court distinguished the sealed-bid method agreed upon in the loss-share agreement as a unique mechanism employed by the FDIC to maximize bid offerings for loan-assets. WM Capital Partners 53, LLC v. Q & S Realty Acquisition Corp., KCD 2013-0681 (Trial Court, June 27, 2016).[33]

These courts seemed to say that the sealed-bid auction was unique to the FDIC and therefore the sale transaction was atypical in commercial dealings. As such, they relied on the sealed bid auction as a factor in favor of preemption. Such reliance is misplaced because sealed bid auctions are commonplace in secondary market sales of nonperforming loan-assets. "[M]ost common types of auctions are executed by a sealed bid, which can be done online, or by a live online auction." Kingsley Greenland & William Looney, *Secondary Market Offers Another Option to Manage Loan Portfolios*, 22 Com. Lending Rev. at 35, 44 (2007). See, e.g., Stonehill Capital Mgmt., LLC v. Bank of the W., 28 N.Y.3d 439, 443, 68 N.E.3d 683, 685 (2016) (Where a lender of various nonperforming mortgage loans retained a third party to manage a competitive online sealed-bid auction of loan-assets). See also Thomas P. Lemke, Gerald T. Lins & Marie E. Picard, *Mortgage & Asset Backed Securities Litigation Handbook*, § 5:9 (2016) ("Lenders may also sell packages of whole loans to investors [. . .] often done on a sealed bid basis.") Alvin L. Arnold, *Real Estate Transactions Structure and Analysis with Forms*, § 8B:2 (2017) ("To conduct loan pool sales, special servicers typically use a sealed bid method to obtain offers, although they may opt to use an auction in some cases."). The FDIC itself has regularly utilized either open-outcry auction or sealed-bid auction methods to sell nonperforming loan-assets. Federal Deposit Insurance Corporation*, Managing the Crisis: The FDIC and RTC Experience*,

---

[32] Translation supplied by WM on Docket No. 92-1, at 11.
[33] Translation supplied by WM on Docket No. 54-1, at 22.

-22-

314, 321-328, Washington, D.C. (1998). Local courts ruled in favor of preemption because of their view that sealed-bid sales are exclusive to FDIC failed-bank resolutions and not regular in market transactions for loan-assets. We disagree with their legal conclusions since sealed bid auctions are standard practice in secondary loan markets.

Third, these Puerto Rico cases did not apply the presumption that Article 1425 is valid until rebutted. No rebuttal of its validity was provided or discussed in declaring Article 1425 preempted.

Therefore, WM has not met its burden to rebut the presumption of the validity of Article 1425. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987).

### ALLIED'S CROSS-MOTION FOR SUMMARY JUDGMENT

We now turn to Allied's amended cross motion for summary judgment.[34] It requests in essence, that (1) WM's motion for summary judgment be denied; (2) it be allowed to raise its redemption right under Article 1425; (3) a certain amount be determined as the redemption price; and (4) WM pay its attorney's fees and costs. For the reasons previously explained, the court grants Allied's cross-motion for summary judgment in part as to count one and two. WM's motion for summary judgment is denied; Allied may assert its redemption right. The remaining counts are denied because disputed issues of fact exist. The redemption price is contested and will be determined at trial. Therefore, summary judgment is not the proper vehicle to address this issue. The Court shall defer considering sanctions and fees until trial is completed.

---

[34] Docket No. 139.

**CONCLUSION**

For the foregoing reasons, WM's motion for summary judgment is denied and Allied's cross-motion is granted in part and denied in part. The court shall enter a separate order setting a pretrial conference. WM is ordered to answer the complaint within fourteen (14) days from entry of this order.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30 day of June, 2017.

_Mildred Cabán_
MILDRED CABÁN FLORES
United States Bankruptcy Judge